**SOUTHERN SURETY CO. et al. v. LAFFER-
TY et al.**

No. 2043.

Court of Civil Appeals of Texas. Beaumont.
Nov. 12, 1931.

Rehearing Denied Nov. 25, 1931.

J. T. Suggs, Jr., of Dallas, and Adams & Mc-
Alister, of Nacogdoches, for appellants.

Gill, Jones & Tyler, of Houston, for appel-
lees.

WALKER, J.

On the 26th day of May, 1926, R. E. King
entered into a written contract with Nacog-
doches county, valid in law, under authority
of Commissioners' Court of Madison County
v. Wallace, 118 Tex. 279, 15 S.W.(2d) 535,
Cherokee County v. Odom, 118 Tex. 288, 15 S.
W.(2d) 538, to install for Nacogdoches county
a "block book system"; that is, an abstract
of property assessed for taxes and also of
property unrendered and where the owners
are unknown, and maps and plats of said
property. For this work Nacogdoches county
was to pay King $35,000 in warrants of $500
each, to be issued to him as follows: Four
warrants on the signing of the contract and

six warrants each month thereafter during the progress of the work until all but eighteen of the warrants stipulated for were issued. These eighteen warrants were to be issued to King when his work was completed and accepted by Nacogdoches county. To secure the faithful performance of this contract, King executed to the county two bonds in the aggregate sum of $35,000, with Southern Surety Company as surety. To save and protect the surety company from liability upon these bonds, King executed to it a bond of indemnity with Dr. T. L. Hurst, Tol Smith, and T. H. Dillon as sureties. King entered upon his contract and prosecuted it with due diligence for about one year, when, having received from the county all the warrants he was entitled to prior to its completion, he abandoned the contract and refused to proceed further with its execution. Each of the warrants delivered to King recited upon its face the date of its issuance and maturity, and that it was issued "for value received"; and: "And, it is hereby certified and recited, that all acts, conditions and things required to be done precedent to and in the issuance of this warrant have been properly done, have happened and been performed in regular and due time, form and manner, as required by law, and that the total indebtedness of said County, including this warrant and all others of this series, does not exceed any constitutional or statutory limitations."

The warrants also made reference to the contract under which they were issued and as recorded in the minutes of the commissioners' court. Immediately after these warrants were issued and delivered to King, he sold and transferred them to appellees J. Edgar Lafferty and W. S. Swilley in the following amounts, quoting from appellees' brief: "On August 14, 1926, September 11, 1926, September 21, 1926, October 15, 1926, November 13, 1926, and December 18, 1926, respectively, appellees bought the warrants involved in this suit from H. C. Burt & Co. and Dunn & Carr, brokers, aggregating a total of twenty-four thousand five hundred dollars ($24,500.00) for both, paying therefor 98 and accrued interest, except three thousand dollars ($3,000.00) bought on December 18th, for which 97 and accrued interest was paid."

After King defaulted on his contract, the county refused to pay these warrants. Thereupon appellees instituted this suit in the district court of Nacogdoches county to recover the amount due thereon according to their face, tenor, effect, and reading—that is, the principal amount, with interest and attorney's fees—and for mandamus against Nacogdoches county ordering it to provide for the payment of the warrants as per the terms of the contract. Nacogdoches county answered by plea of failure of consideration, and impleaded its surety, asking for judgment against its

surety only in the event it was held liable upon the warrants. The surety company thereupon impleaded its sureties. Upon trial to the court without a jury, judgment was rendered in favor of appellees for $23,000 of their warrants, but without interest and attorney's fees, though the warrants stipulated therefor, and for mandamus, as prayed for. The county was given judgment over against the surety company for $11,000, and the surety company was awarded a like judgment against its surety, Dr. T. L. Hurst. The pleas of privilege filed by its other sureties, Tol Smith and T. H. Dillon, were sustained by the trial court. King was also made a party defendant, and judgment was likewise given against him in favor of the county and the different sureties. In our discussion of the case, J. Edgar Lafferty and W. S. Swilley will be referred to as appellees, Nacogdoches county as the county, and Southern Surety Company as surety company.

Conceding that the warrants sued on herein were nonnegotiable instruments, appellees brought their suit upon the theory that, having recited in the warrants that they were issued for value received and that all things required by the contract necessary to their issuance had been performed, the county was estopped to deny the truthfulness of these recitations and to plead failure of consideration as a defense against the warrants. Though appellees pleaded estoppel against the right of the county to deny the truthfulness of the warrant recitations, in view of the following concession made by the county and the surety company in their briefs, we think this issue of estoppel goes out of the case: "At the inception of our discussion hereunder, let us review, briefly, some of the facts that have been disclosed in the preceding statements. It will be recalled that while King, the contractor, abandoned his contract, this abandonment came after he had worked for over a year thereunder. He had done a large amount of work in compiling sketches and data necessary for the relatively quick process of transcribing the material thus accumulated into permanent record form. As each installment of warrants was issued to him, and at the time of the passage of each of the orders here in question, King came before the Commissioners' Court and made a showing of the work which he had done. Was this work which King had done of value to the county? Doubtless before this the Court will have perceived that such work was of value to the county, provided King carried on the work to completion and placed it in useable form. The contractor had expended a large amount of effort for the benefit of the County, which was of present potential value to the County. How, then, did the complete failure of consideration for the warrants come about? The question is already answered in the foregoing

statement hereunder. After doing more than a year's work under his contract, King quit the job, before its completion, and carried away with him practically everything that he had done up to that time. And so it appears that while, as a matter of fact, the County had received value for the warrants at the time of the passage of the various orders in question, yet the value of that which it had received was destroyed by an act of the contractor which occurred at a time subsequent to the pasasge of all of the court orders here in question."

This follows because appellants, the county and the surety company, concede as facts all the recitations contained in the warrants which appellees seek to establish by estoppel; that is, they concede as a fact that "the County had received value for the warrants at the time of the passage of the various orders in question."

█ We agree with appellants that these recitations in the warrants mean only that at the time they were issued the county had received value therefor; and we agree with them further that, notwithstanding the recitations that the warrants were issued for value received and that all things necessary for their issuance had been performed, the reference in the warrants to the contract under which they were issued and that it was recorded in the minutes of the commissioners' court of the county made the contract as much a part of the warrants as if written therein; and we agree further with appellants that under the contract the county was contracting for a complete "block book system," and, because of the technical nature of the work actually performed by King in preparation of the block book system, the work actually performed by him was worthless to the county at the time the contract was breached, and that the conduct of King as between him and the county constituted a total failure of consideration. But, notwithstanding the concessions made, because the county issued the warrants with the recitations just enumerated, which in fact were true, and because appellees bought the warrants with knowledge of these recitations, relying thereon, the county is estopped as between it and them to urge the defense of failure of consideration. The clear intent of the contract was that these warrants were issued to King with the right upon his part to sell them upon the open market; otherwise the conditions providing for their issuance was meaningless. If in the hands of purchasers from King, the warrants were to be subject to the defense that he had defaulted in his work, then the purchasers of his warrants would become, to that extent, sureties for him for the faithful performance of his duties. It is impossible to say, upon the face of the contract and the warrants, that appellees, as purchasers of the warrants,

intended to assume that relation. By issuing these warrants, the county intended that King should sell them and consented to become liable to King's vendees as of the date they purchased the warrants. By executing the surety bond, the surety company agreed to the stipulation that these warrants should be issued as per the terms of the contract, with the understanding that King would sell them to the general public and that, in the hands of the purchaser, they would constitute liabilities against the county. The law authorized the county to issue these warrants to King, and also authorized him to sell them. It was therefore the intent of the law that, once legally and regularly issued, they should forever be binding obligations of the county. In issuing the warrants, the county was fully indemnified against the failure of consideration by the surety company. This was one of the liabilities to be inferred from the surety bonds. If diligent in protecting its rights under these bonds, the county would lose nothing, whether King finished his work or not. Discussing this question on facts similar to this case, the Supreme Court of North Dakota in Dakota Trust Co. v. City of Hankinson, 53 N. D. 356, 205 N. W. 990, 994, said:

"It retains the withheld portion of the consideration and the contractor's bond as security for the uncompleted part of the contract. While, as the appellant contends, the warrants are not negotiable in the sense that a purchaser and transferee takes them free of defenses available to prior parties as between themselves, it does not follow that they may not be transferred in circumstances that will preclude the obligor from asserting as against the transferee that, by reason of facts occurring subsequently, it had acquired a defense which it could urge if the warrants were still in the hands of the contractor. Long Beach School District v. Lutge et al., 129 Cal. 409, 62 P. 36; The Newport Wharf & Lumber Co. v. Drew et al., 125 Cal. 585, 58 P. 187. So here, the city, having by resolution of its city council, declared the contract to have been so far performed that the contractor was entitled to a stated portion of compensation, and it having given to it written evidence of its right to be satisfied protanto out of funds which it was the city's duty to raise, is precluded, as against any person relying upon the representation, to assert the contrary.

" * * * Manifestly, no warrant would be salable if liable to be defeated on account of the subsequent failure of the contractor. Yet the statute expressly authorizes a sale. We are of the opinion that the purchaser of warrants, who in good faith relies upon a record made by the city council showing that they were regularly issued under the contract, holds them free from defenses arising out of subsequent breaches of the contract. Long Beach School District v. Lutge et al., su-

pra; Newport Wharf & Lumber Co. v. Drew et al., supra."

In the judgment of this court, the county, having lawfully issued and delivered to its contractor, King, these warrants, for value received at the time they were issued, with the intent that King should sell them to the general public, should be estopped to assert against their validity in the hands of the purchasers the defense of failure of consideration. Such warrants, in the hands of good-faith purchasers, once valid, are always valid.

The trial court concluded, as a matter of law, that appellees were not entitled to recover interest and attorney's fees, though each of the warrants stipulated for interest at 6 per cent. from maturity, and for attorney's fees at 10 per cent. in the event the county defaulted in their payment and the warrants were placed in the hands of attorneys for collection. Citing Commissioners Court v. Wallace, and Cherokee County v. Odom, both cases cited above, appellees say the Supreme Court has held against this contention. They state their position on this issue as follows: "We realize the futility of arguing against the law as laid down by the Supreme Court, but there might have been in the Cherokee County and Madison County Cases some facts not apparent from the opinion not present in this case that had a bearing upon the Court's holding, but we are frank to say we know of none. We respectfully submit that unless the statute does specifically prohibit the payment of interest and attorneys' fees, appellees should not be denied a recovery of these items. With great deference and respect for the opinion of the Supreme Court, it seems to us that the statute is not susceptible to the construction denying such recovery."

On authority of these cases we sustain the ruling of the lower court denying appellees interest and attorney's fees. For the reasons stated, the judgment in appellees' favor against Nacogdoches county should in all things be affirmed.

Against the judgment for $11,000 in favor of the county against it, the surety company makes the following contentions: Prior to March 1, 1927, the county collected in excess of $10,000 of the delinquent taxes covered by the contract, and of this sum, prior to March 1, 1927, deposited in the warrant funds only $321.26. The balance of these collections were used by the county for other purposes. From March 1, 1927, to March 10, 1930, the county collected from these delinquent taxes $14,494.02 (the gross collections from the date of the contract amounting to $24,602.18), and of this sum, in addition to the $321.26, deposited in the warrant funds only $629.94. This last sum was deposited subsequent to the filing of this suit in 1929. It was shown by expert testimony that, at the date of the con-

tract, the county and King had the right to expect that at least $80,000 would be collected from delinquent taxes before the warrants matured. Notwithstanding the contract contained no express condition requiring the county to pay into the warrant funds the 30 per cent. of the delinquent taxes as and when collected, the surety company contends it should be given that construction, and that the failure to make these payments as and when the delinquent taxes were collected constituted an alteration in the contract sufficient to relieve it from its surety obligations. This contention is denied. That the contract contains no express stipulation regulating the time' when the 30 per cent. should be paid is made clear from the following summary of the contract made by the surety company as a part of its statement in support of this proposition:

"As we have shown heretofore, the contract here in question between Nacogdoches County and R. E. King provided that the latter should be paid for his work in county warrants. By Sections I and II and the preamble of the contract it was provided that these warrants should be payable out of thirty per cent. of all delinquent taxes for the year between December 31st, 1908 and February 1st, 1926, collected subsequent to the execution of the contract. By Section XII the contract provided that this percentage of such delinquent taxes so collected should be placed in the funds known as 'Abstract Map and Plat Funds Class A and Class B.'

"* * * The contract between King and the County provided that the warrants could be paid only out of thirty percent of delinquent taxes collected, as provided in the contract. Payment from any source other than the 'Warrant Funds' was expressly prohibited. And it was provided that the warrants should be paid in their numerical order.

"King obligated himself, in his contract, to actively assist, among other officers, the Tax Collector in actually collecting the taxes in question."

The contract imposed no burden upon the county except to pay into the warrant funds 30 per cent. of the delinquent taxes. Since it appeared beyond controversy that the county and King had the right to expect collections of at least $80,000 from the delinquent taxes, the failure to pay into the warrant funds 30 per cent. of the first $10,000 collected at a time when King had not breached his contract did not constitute an alteraion or novation in the contract between them. This argument also disposes of the contentions of the surety company relating to all subsequent collections, but, as these subsequent collections were made after the contract was breached, the county was not required, as between it and the surety company, to set apart any part thereof for the warrant funds.

 Under its contract of suretyship, on the default of King, the surety company had the right to complete the contract. On June 25, 1927, after King had defaulted on May 16, 1927, the county notified the surety company in writing of the default and demanded that it "take action towards completing said contract at once." This notice was ignored by the surety company until June 21, 1928, when it wrote the county demanding that it "forthwith institute suit upon such contract," citing article 6244, R. S., and stating that, unless such suit was instituted, its · surety bonds would "be terminated and discharged." After receiving this notice, the county filed no suit against the surety company until it answered in this suit, making a part of its answer its cross-action against the surety company, praying for relief against it only in the event the warrants sued upon were held legal and binding. At the time the cross-action was filed, two terms of the district court of Nacogdoches county had convened since the county had received the surety company's written demand that it file suit. The following are the statutory provisions relied upon by the surety company:

"Art. 6244. Any person bound as· surety upon any contract for the payment of money or the performance of any act, when the right of action has accrued, may require by written notice, the creditor or obligee forthwith to institute suit upon such contract.

"Art. 6245. If the creditor or obligee, not being under legal disability, shall fail to bring his suit to the first term of the court thereafter, or to the second term showing good cause for the delay and prosecute the same to judgment and execution, the surety giving such notice shall be discharged from all liability thereon."

On these facts, the surety company pleaded that the failure of the county to file suit against it and King, at the first term of court after notice, discharged it from liability on its bonds. Answering this plea, the county pleaded that King was insolvent at the time he breached his contract and at all times thereafter. The surety company conceded that these allegations were true. On this ground the trial court refused to discharge the surety company from liability on its bonds. The decisions of the Courts of Civil Appeals are in conflict on this proposition. The holding of this court in Bumpus v. Lovejoy, 196 S. W. 631, and of the Court of Civil Appeals of the Fifth District in Robertson v. Angle, 76 S. W. 317, supports the judgment of the trial court. But in Central Bank & Trust Co. v. Hill, 160 S. W. 1099, and Sullivan v. Dwyer, 42 S. W. 355, by the Court of Civil Appeals of the Fourth District, it was held that the insolvency of the principal was an immaterial issue. In its oral argument on submission, the surety company emphasized the fact that a writ of error was refused in the

Hill Case. We do not consider this holding as controlling, because that case was correctly decided on other grounds. Also, as we construe all four of these cases, the holding of each of them on this proposition was not necessary to its decision; that is to· say, they were all correctly decided on other grounds. Because the judgment of the court on this point should be sustained on the following proposition, we do not determine the merit of this conflict. "Right of action,", as that term is used in article 6244, means an affirmative right to be asserted by the obligee, necessary to effectuate the purposes of the contract between him and the surety's principal, secured by the obligation of the surety. Thus, illustrating by the facts of this case, had the county sued for actual damages on the ground that King did not deliver the block book system, or for nominal damages on the same' ground, or had the county paid King money on his contract instead of these warrants and then sued for reimbursement for the amount so paid, the cause of action would have been within the protection of this article. But such was not the nature of the county's cause of action asserted in this case. Its cause of action was merely for indemnity against loss on these warrants. The contract may be thus summarized. The surety company proposed to the county that, if it would let the contract to King and issue to him from time to time these warrants, it would protect the county from liability thereon, in the event King failed to deliver the block book system. There was no liability against the county on this cause of action unless these warrants were valid. The determination of that issue matured the liability of the surety company. It follows that this cause of action had not accrued to the county when the notice to file suit was given and did not mature until this suit was filed, when, because of our system of pleading, the county had the right to implead King and the surety company, under the conditions of the principal contract and of the surety bonds. Because, under the provisions of this article, the surety can require suit to be filed only "when the right of action has accrued," it follows that the failure of the county to file suit after receipt of the written notice did not discharge the surety company. It is no answer to this contention to say that the surety bonds provided that the surety company might finish the contract and that, in its written notice of King's default, the county made that demand of the surety company. The right to finish the contract was personal to the surety company. Had the surety company elected to finish the contract, it would thereby have discharged its bonds. But as it did not so elect, its liability upon the bonds rested entirely upon the county's liability upon the warrants. It is also no answer to our conclusion to say that the county could have filed suit to cancel these warrants. Such a cause of action would not come with-

in the term "right of action," as we have construed the statute. Under the bonds, it was the duty of the surety company to protect the county from liability on these warrants, and not the duty of the county to protect the surety company.

▮ Because the county recited in its warrants that they were issued "for value received," and that all conditions necessary for their validity had been duly performed, the surety company asserts that the county committed an act resulting in an estoppel to plead against the warrants the failure of consideration, and that the effect of these recitals was to impose an additional obligation against the surety company not contemplated by the contract. While the contract contained no provision that these recitals should be contained in the warrants, the warrants were issued strictly in accordance with the contract and for the purpose of sale, with the intent that they should be valid against the county when bought by good-faith purchasers. Since these recitations are conceded by the surety company to be true as and when made, it necessarily follows that by executing its surety bonds it consented to these conditions.

▮ There was expert testimony to the effect that the work King contracted to do for the county was worth only $20,000, and that by contracting to pay $35,000 the county paid King $15,000 more than his work was worth. $9,000 of the original contract price remained in the hands of the county at the time King breached his contract. On this testimony the trial court fixed the value of the work covered by King's contract at $20,000, and, as the county had not delivered $9,000 of the original contract price, awarded a judgment against the surety company for only $11,000. There was also testimony by an expert block book maker that he was willing to take over King's work, which the surety company's sureties tendered to the county, and finish the block book system for $9,000. On these facts the surety company contends, first, there was no testimony to support the judgment for $11,000; second, the county rested under the duty to mitigate its damages by employing an expert block book maker to finish King's work for $9,000; and, third, because the county could have had the work finished for the $9,000 of the original contract price retained by it in its possession, it has suffered only nominal damages. There is no merit in these contentions. Having ratified King's contract by becoming surety thereon to the extent of $35,000, the surety company could not, except upon allegations of fraud and mistake, which were not made, assert the defense that the county had contracted to pay King too much for his work. That issue was foreclosed against it when, with knowledge of the conditions of the contract, it agreed to indemnify the county for any loss thereon. It was surety upon a $35,000 contract and not a $20,000 contract. Under the King contract the county's loss was $23,000, which was the proper measure of the surety company's liability; that is to say, having contracted that the county should issue to King these warrants, its surety obligation was to protect the county from liability thereon in case of King's default. Though there is no basis for the $11,000 judgment; yet, because the true measure of the liability of the surety company was $23,000, it cannot assert error under the proposition that the judgment, as rendered, was without support. Cockerham v. Gilchriest Chevrolet Co. (Tex. Civ. App.) 39 S.W.(2d) 186. 3 Tex. Jur. 575, holds that, for fundamental error to constitute reversible error, it must not only be fundamental, but "must also operate to the injury of the appellant." In this connection it should be said that the county makes no complaint that it was not awarded full recovery.

▮ There is no merit in the contention that the county rested under the duty to mitigate its damages by taking over the unfinished King contract and finishing the work by the services of another block book maker. This work was of a highly technical nature. Its value and usefulness to the county depended upon the skill with which the work was done. The county contracted with King because of its confidence in him as an expert workman. Because of the nature of this work, it was not a condition of the surety bonds that the county, upon King's default, could be compelled to employ some other block book maker to finish the contract. Under its bonds the surety company had the right to tender a performance, which it declined to do, but not the right to require the county to have the work completed. This argument also answers the contention that the county has suffered only nominal damages. Having contracted for the technical skill of Mr. King, it cannot be said that it has suffered only nominal damages because another block book maker was willing to finish the work for $9,000. Giving the commissioners' court of Nacogdoches county the presumption of good faith, to which it is entitled, we must conclude that, in the judgment of the court, it was receiving from King a $35,000 block book system at a time when other block book makers were willing to do the work for $20,000. Also, the presumption should be indulged that, regardless of the testimony of the experts, it was the judgment of the commissioners' court that a $20,000 block book system was not of equal worth with the work King was qualified to do.

The judgment of the lower court is in all things affirmed.